The Full Commission has reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner Margaret Morgan and the briefs and arguments on appeal. The appealing party has shown good ground to reconsider the evidence. Upon reconsideration of the evidence of record, the Full Commission reverses the prior Opinion and Award and enters the following Opinion and Award.
 **********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 19 September 1996 as:
 STIPULATIONS
1. Plaintiff's alleged date of injury is 15 February 1995.
2. On that date, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On 22 September 1993, an employer-employee relationship existed between the parties.
4. Great American Insurance Company is self-insured.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing on 19 September 1996, plaintiff was a 33 year old high school graduate whose work history includes employment as an EKG technician and employment with several insurance companies, primarily doing clerical work.
2. Plaintiff began working for defendant performing clerical work in May of 1987. Approximately ninety percent (90%) of her work was performed at a computer. She last worked for defendant on 22 September 1993.
3. On 29 December 1992, plaintiff experienced the onset of pain in her left wrist. Plaintiff was initially examined by Dr. Tomas Ojeda at Kaiser Permanente. However, when her symptoms did not improve, she began treating with Dr. George Edwards, Jr., an orthopaedic surgeon, who diagnosed left carpal tunnel syndrome. On 12 April 1993, Dr. Edwards performed a left carpal tunnel release. Plaintiff reached maximum medical improvement by 25 August 1993 with a six percent (6%) permanent partial disability to her left hand.
4. On 25 August 1993, plaintiff was experiencing tenderness in left hand related to the flexor tendons. This is supported by the notes of Dr. Edwards from that date, in which he transcribed that plaintiff had "left hand: Moderate tenderness over the flexor tendons . . . ."
5. On 15 September 1993, plaintiff returned to Dr. Edwards with pain and swelling in her right hand as well. Dr. Edwards diagnosed plaintiff with right hand carpal tunnel syndrome and performed a right carpal tunnel release on 18 November 1993.
6. On 23 February 1994, plaintiff reached maximum medical improvement with respect to her right hand carpal tunnel syndrome and was assigned a seven (7%) percent permanent partial disability to her right hand. Dr. Edwards released plaintiff to return to work, but recommended against any repetitive work such as keyboard work or prolonged periods of writing, pinching, gripping, etcetera.
7. On 1 December 1993, the parties entered into an Industrial Commission Form 21 Agreement for Compensation in I.C. file number 333683 relating to plaintiff's left hand claim. This was approved by the Industrial Commission on 1 March 1994. Pursuant to this agreement, plaintiff was paid temporary total disability benefits for the period from 7 January 1993 through 25 April 1993.
8. Subsequently, the parties entered into a Form 26 agreement relating to the same claim, pursuant to which plaintiff was paid for 12 weeks of permanent partial disability for the six percent rating to her left hand.
9. On 4 February 1994, the parties entered into an Industrial Commission Form 21 Agreement for Compensation in I.C. file number 372171. This agreement was related to her claim for her right hand carpal tunnel syndrome. This was approved by the Industrial Commission on 24 May 1994 and provided for payments to plaintiff of temporary total disability benefits beginning on 24 September 1993.
10. The parties entered into an Agreement of Final Settlement and Release in I.C. file numbers 333683 and 372171, which was approved by the Industrial Commission on 24 October 1994. Pursuant to the Agreement, defendant agreed to pay to plaintiff $35,000.00 and medical expenses related to plaintiff's bilateral carpal tunnel syndrome for another two years.
11. On 15 February 1995, plaintiff returned to Dr. Edwards with complaints of "fullness and tenderness" in her right forearm. Following an examination, Dr. Edwards noted a "positive Tinel's directly over the middle of the forearm" and "maximal tenderness directly over the pronator in this same region." Plaintiff was diagnosed with right pronator syndrome and tendinitis, which Dr. Edwards opined were work related.
12. Notes form Dr. Edward's examination of 15 February 1995 indicate that plaintiff's pronator syndrome was a "continuation of her previous work[ers'] compensation problem." Pronator syndrome is a condition often caused by repetitive motion activities, as is carpal tunnel syndrome. However, this was a new condition for which Dr. Edwards had not previously treated plaintiff and a distinct one, which primarily affects the forearm and not the hands. This passage in Dr. Edwards' notes does not mean that plaintiff's pronator syndrome was caused by her carpal tunnel syndrome or that it was medically related in any way to her prior condition. The reasonable inference from this passage is that Dr. Edwards was drawing a comparison between plaintiff's pronator syndrome and her prior carpal tunnel syndrome due to the fact that both conditions were related to plaintiff's repetitive motion job, not to each other.
13. There are no risk factors associated with pronator syndrome other than repetitive and strenuous use of the forearms. The condition does not occur idiopathically. With regard to her tendinitis, Dr. Edwards opined that plaintiff's restrictive and repetitive duties at work could have aggravated her condition to such a degree that it would not improve with rest alone, but would instead require surgery.
14. No evidence was presented of any injury or activity other than plaintiff's employment with defendant which could account for her development of bilateral pronator syndrome and tendinitis. Absent other possible causes, Dr. Edwards testified that it was likely that plaintiff's employment with defendant significantly contributed to her tendinitis and pronator syndrome conditions.
15. Dr. Edwards also testified that plaintiff's bilateral pronator syndrome and tendinitis were due to causes and conditions characteristic of and peculiar to her repetitive work in her employment with defendant and were not ordinary diseases of life to which the public generally is exposed.
16. On 14 March 1995, Dr. Edwards performed a right forearm surgery for plaintiff's pronator syndrome. In an examination on 20 April 1995, Dr. Edwards noted improvement, but on 14 June 1995, plaintiff had increased tenderness and swelling over the first extensor tendon compartment. Dr. Edwards then diagnosed right DeQuervain's tendinitis which was related to plaintiff's work-related tendinitis. Dr. Edwards treated plaintiff's DeQuervain's tendinitis with an injection.
17. Dr. Edwards prescribed a course of physical therapy, following which he examined the plaintiff on 14 August 1995. Upon examination, Dr. Edwards noted no tenderness over the forearm or in the region of plaintiff's pronator syndrome, and he noted further that testing had indicated excellent grip strength with both hands. Her DeQuervain's tendinitis was much improved following the injection, but she still had some tenderness that required no treatment. As opined by Dr. Edwards, by 14 August 1995, plaintiff reached maximum medical improvement with regard to her right DeQuervain's tendinitis and right pronator syndrome, the latter of which had resolved with minimal residual disability. Plaintiff was assigned a permanent partial disability rating for her right hand of nine percent (9%), which included the seven percent (7%) that resulted from her carpal tunnel syndrome.
18. Dr. Edwards next saw plaintiff on 2 November 1995 with complaints of gradually progressive pain in the left forearm. Dr. Edwards diagnosed her with left forearm pronator syndrome and prescribed a wrist splint. He did not believe that her symptoms were severe enough for surgery.
19. Dr. Edwards last saw plaintiff on 9 May 1996. At that time, he diagnosed her with right thoracic outlet syndrome, right shoulder impingement syndrome, which were not work related. Dr. Edwards also reaffirmed his diagnosis of left pronator syndrome, and opined that plaintiff's employment with defendant significantly contributed to the development of this condition, as well as her left side tendinitis.
20. Dr. Tomas Ojeda was stipulated to be a physician with expertise in the field of internal medicine and was plaintiff's treating physician from 1992 through 1995. Dr. Ojeda diagnosed plaintiff's symptoms and managed her care during this period of time, including the referral to Dr. Edwards. Dr. Ojeda diagnosed plaintiff as suffering from a number of medical conditions, including residual pain and inability to use her hands and arms, depression, irritable bowel syndrome and morbid obesity. In his opinion, plaintiff's employment with defendant and repetitive job duties were substantial contributing factors in the development of her pronator syndrome in both arms. Dr. Ojeda further opined that plaintiff's internal bleeding, ulcers, gastrointestinal symptoms, depression and anxiety were more likely than not caused or aggravated by her work related injuries, the resulting surgeries, her medication and chronic pain. It is Dr. Ojeda's opinion that plaintiff will require future medical treatment, including psychological and psychiatric care, follow up with neurologists or neurosurgeons for nerve problems, orthopaedic surgeons for hand, wrist and arm problems and chronic pain syndrome and internal medicine specialists for her gastrointestinal problems.
21. Dr. Warren A. Blackburn, a family practitioner in Louisburg testified that he has been treating plaintiff since March of 1995 for a number of problems, including chronic shoulder and arm pain. Dr. Blackburn diagnosed plaintiff with fibromyalgia, noting that her pain is chronic. In his opinion, her current shoulder and arm problems are more likely than not related to her employment with defendant. Dr. Blackburn recommended plaintiff receive treatment from a rheumatologist for her fibromyalgia. In his opinion, plaintiff has been unable to return to her prior position with defendant since began treating her and she would have difficulty maintaining regular attendance in any employment due to the fact that she can only control her pain through the use of narcotic medications.
22. David B. Arthur, stipulated to be an expert in the field of vocational rehabilitation, is a vocational rehabilitation counselor with the North Carolina Division of Vocational Rehabilitation. He has provided vocational services to plaintiff since 1995. As a result of testing, Mr. Arthur determined plaintiff's transferrable skills place her in the unskilled category. Unskilled workers have the most difficulty finding employment. In his opinion, plaintiff would have a difficult time finding and maintaining full-time employment.
23. Defendant presented no vocational evidence of any employment suitable to plaintiff's capacity and no evidence that, even with medical treatment and improvement in her symptoms, she is likely to be able to return to competitive employment without significant modifications.
24. Defendant contends that the Settlement Agreement previously entered into by the parties and approved by the Commission on 24 October 1994 bars plaintiff's present claim. Defendant cites the following language from the agreement in support of its contention:
 "Whereas, it is further understood that the rights and remedies of employee against employer and/or insurer as a result of employee's employment and her bilateral carpal tunnel syndrome are governed and controlled by the North Carolina Workers' Compensation Act and that all such rights are being compromised, adjusted, and forever resolved." (emphasis added)
The pertinent language of the above passage, "as a result of employee's employment and he bilateral carpal tunnel syndrome," is read by defendant as not only settling plaintiff's claim for her carpal tunnel syndrome, but to also settle all other claims she may have which are related to her employment. However, the proper interpretation of this language is that the agreement settles plaintiff's claim for her carpal tunnel syndrome which developed as the result of her employment, not that it settles her carpal tunnel syndrome claim and all other claims. Therefore, based upon the plain meaning of this language, defendant's interpretation is not reasonable.
25. The language cited by defendant in support of its contention is in the section of the agreement which recites the general facts of the claim and the contentions of both parties. Later in the agreement, the parties listed in detail what was "specifically agreed" to. In paragraph number (4) of this section, the parties documented that plaintiff accepted the offered settlement:
 " . . . in full final and complete satisfaction of any and all claims under the North Carolina Workers' Compensation Act which employee, her dependents, estate or other representatives may have against the employer or the insurer now or in the future by reason of her bilateral carpal tunnel syndrome, or any injury, condition, change of condition, or claim relating therefrom." (emphasis added)
This language clarifies that the agreement settled only plaintiff's claim for her carpal tunnel syndrome and did not preclude her from pursing other claims which were not related to that condition.
26. Plaintiff's bilateral pronator syndrome and tendinitis, which were not diagnosed until 15 February 1995, are not related to her carpal tunnel condition and her claim for these conditions is not precluded by the prior Settlement Agreement.
27. Plaintiff's bleeding ulcers, gastrointestinal condition, fibromyalgia, anxiety and depression have been medically related to her continued medical problems, including her carpal tunnel syndrome. However, this causal connection includes being linked to her bilateral pronator syndrome and tendinitis. Therefore, her claim for these conditions is not precluded by the prior Settlement Agreement.
28. Plaintiff's employment with defendant caused or significantly contributed to the development of her bilateral pronator syndrome and tendinitis.
29. Plaintiff's employment with defendant placed her at an increased risk of developing her bilateral pronator syndrome and tendinitis as opposed to members of the general public.
30. Plaintiff's internal bleeding, ulcers, gastrointestinal symptoms, depression and anxiety were caused or significantly aggravated by her work related injuries, the resulting surgeries, her medication and chronic pain. There has been no apportionment regarding the cause of these conditions between plaintiff's carpal tunnel syndrome, which was the subject of the prior Settlement Agreement, and her bilateral pronator syndrome and tendinitis, which were later diagnosed.
31. Plaintiff has reached maximum medical improvement with regards to her bilateral pronator syndrome. She has not reached maximum medical improvement from and will require future medical treatment for her other conditions.
32. As the result of her bilateral pronator syndrome, tendinitis and related medical conditions, plaintiff has been incapable of earning wages in her former position with defendant or in any other employment from 15 February 1995, the date on which her pronator syndrome and tendinitis were first diagnosed, through the present and continuing.
33. At all times relevant herein, plaintiff had an average weekly wage of $420.00 yielding a compensation rate of $280.01.
34. Counsel for plaintiff requests an attorney's fee in the amount of thirty-three and one-third percent (33 1/3%) of the compensation awarded in this matter, rather than the usual and customary rate of twenty-five percent (25%) for claims preceding to the Full Commission level. Counsel for plaintiff has also submitted a fee contract, signed by plaintiff. Counsel for plaintiff has presented no evidence of any unusual circumstances or difficulty regarding this claim to warrant a fee greater than the usual and customary fee of twenty-five percent (25%). Based upon the amount and type of work performed in pursuit of plaintiff's claim and the fact that it has only reached to Full Commission level, counsel for plaintiff's request for a thirty-three and one-third percent (33 1/3%) attorney's fee is unreasonable.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. At all times relevant herein, plaintiff had an average weekly wage of $420.00 yielding a compensation rate of $280.01. G.S. § 97-2(5).
2. Plaintiff's present claim before the Industrial Commission is not precluded by the prior Settlement Agreement and said Agreement does not have to be set aside for her to pursue this claim. G.S. § 97-17.
3. Plaintiff's employment with defendant exposed her to an increased risk of developing bilateral pronator syndrome and tendinitis and caused her to develop these conditions. G.S. § 97-53(13). Plaintiff's internal bleeding, ulcers, gastrointestinal symptoms, depression and anxiety are the result of and are causally related to her pronator syndrome and tendinitis. Id.
4. As the result of her pronator syndrome, tendinitis and related medical conditions, plaintiff is entitled to be paid by defendant temporary total disability compensation at the rate of $280.01 per week for the period of 15 February 1995 through the present and continuing until such time as she returns to work or until further order of the Commission. G.S. § 97-29.
5. As the result of her pronator syndrome and tendinitis and related medical conditions, plaintiff is entitled to have defendant pay for all related medical expenses.
G.S. § 97-25.
6. Based upon the usual and customary fee awarded to attorney's for pursuing claims which reach the Full Commission level, counsel for plaintiff is entitled to an attorney's fee of twenty-five percent (25%) of the compensation to which plaintiff is entitled. G.S. § 97-90.
 ************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses in part and affirms in part the Deputy Commissioner's holding and enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $280.01 per week for the period of 15 February 1995 through the present and continuing until such time as she returns to work or until further order of the Commission. From the amounts of having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to a reasonable attorney's fee herein approved,
2. Defendant shall pay for all medical expenses related to plaintiff's of pronator syndrome, tendinitis and related medical conditions.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded above is approved for counsel for plaintiff. From the amounts having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff with counsel for plaintiff receiving every fourth check thereafter.
4. Defendant shall pay the costs.
 S/ _______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ _____________________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER